IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BENJAMIN KUNZE, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:20-CV-1276-N |
| | § | |
| BAYLOR SCOTT & WHITE HEALTH, | § | |
| *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

This Order addresses Plaintiffs' motion for partial summary judgment regarding liability [77]. Because Defendants did not pay Plaintiffs on a salary basis, the Court grants summary judgment as to liability against Defendant HealthTexas Provider Network. However, because there are genuine disputes of material fact as to the Defendants' status as joint employers, the Court does not grant summary judgment against Defendant Baylor Scott and White Health.

### I. ORIGINS OF THE DISPUTE

The Plaintiffs in this case are medical professionals known as Advanced Practice Professionals ("APPs"). Plaintiffs brought claims against Defendants Baylor Scott and White Health ("BSWH") and HealthTexas Provider Network ("HTPN") to recover unpaid overtime compensation pursuant to the Fair Labor Standards Act ("FLSA").[1] Plaintiffs claim that Defendants have paid Plaintiffs and similarly situated employees at straight time

---

[1] Codified at 29 U.S.C. § 201 *et seq*.

MEMORANDUM OPINION AND ORDER – PAGE 1

for on-the-clock hours regardless of the hours actually worked. Plaintiffs allege that Defendants did not pay them for certain off-the-clock hours worked in violation of FLSA. Plaintiffs filed a partial motion for summary judgment, arguing that Defendants' failure to pay a salary rendered Plaintiffs nonexempt and that Defendants cannot rely on the window of correction or safe harbor defenses.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a party bears the burden of proof on an issue, "he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). When the nonmovant bears the burden of proof, the movant may demonstrate entitlement to summary judgment either by (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (2) arguing that there is no evidence to support an essential element of the nonmovant's claim or affirmative defense. *Celotex*, 477 U.S. at 322–25.

MEMORANDUM OPINION AND ORDER – PAGE 2

Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1). Factual controversies are resolved in favor of the nonmoving party "only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 525 (5th Cir. 1999) (quoting *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995)).

### III. THERE IS A GENUINE DISPUTE OF MATERIAL FACT AS TO BSWH AND HTPN'S JOINT EMPLOYER STATUS

#### A. *Legal Standard to Determine Joint Employer Status*

FLSA defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to any employee." 29 U.S.C. § 203(d). In the Fifth Circuit, a party's status as a FLSA employer is determined using the four-pronged economic realities test. *Gray v. Powers*, 673 F.3d 352, 354 (5th Cir. 2012). The economic realities test asks "whether the alleged employer: (1) possessed the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.*

at 355 (cleaned up).  The test is holistic: "a party need not establish each element in every case."  *Orozco v. Plackis*, 757 F.3d 445, 448 (5th Cir. 2014) (citing *Gray*, 673 F.3d at 357).

### B. Defendants Have Raised a Genuine Issue of Material Fact as to Joint Employment

Plaintiffs argue that their offer letters demonstrate BSWH's status as a joint employer: the letters (1) state that BSWH could terminate Plaintiffs' employment at any time, (2) designate BSWH supervisors and hospitals, and (3) set compensation rates.  Pls.' App. 79–86 [78-2].  But this evidence is not definitive.  Defendants have produced contradictory evidence showing that although BSWH prepared the offer letters for the APPs, HTPN continued to make all staffing decisions.  Defs.' App. 5 [84].  Moreover, HTPN supervises the APPs through HTPN-employed practice administrators and physicians who schedule shifts, approve payroll, make disciplinary decisions, and pay Plaintiffs' wages.  *Id*.  A reasonable jury could find that BSWH did not jointly employ Plaintiffs, and accordingly, the Court denies summary judgment against BSWH.

### IV.  LEGAL STANDARD FOR FLSA'S LEARNED PROFESSIONAL EXEMPTION

FLSA "establishes the general rule that employees must receive overtime compensation at one and one-half times the regular rate for hours worked in excess of 40 hours during a seven-day workweek."  *McGavock v. City of Water Valley, Miss.*, 452 F.3d 423, 424–425 (5th Cir. 2006) (citing 29 U.S.C. § 207(a)).  But learned professionals may be exempt if the employee: (1) is "compensated on a salary basis"; and (2) has the "primary duty" of performing work "requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction."  29

C.F.R. §§ 541.300–01; *see also Hewitt v. Helix Energy Sols. Group, Inc.*, 15 F.4th 289, 290 (5th Cir. 2021) (en banc) (explaining that employees must be paid on a salary basis to fall within the executive, administrative, or professional exemptions), *cert. granted*, 142 S. Ct. 2674 (2022).  Employers bear the burden of proof to show the employee is exempt from the general rule.  *White v. U.S. Corr., L.L.C.*, 996 F.3d 302, 307 (5th Cir. 2021).  The parties agree that Plaintiffs meet the duties test of the learned professional exemption but disagree as to whether Defendants paid Plaintiffs on a salary basis.  *See* Pls.' Summ. J. Br. 10 [78]; Defs.' Summ. J. Resp. Br. 13 [83].

Department of Labor (DOL) regulations explain that an employee is paid on a "salary basis" when (1) "the employee regularly receives each pay period . . . a predetermined amount," (2) "constituting all or part of the employee's compensation," and (3) "which amount is not subject to reduction because of variations in the quality or quantity of the work performed."  29 C.F.R. § 541.602(a).   "[A]n exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked." *Id.* § 541.602(a)(1); *Escribano v. Travis Cnty.*, 947 F.3d 265, 267 (5th Cir. 2020) ("'Salary basis' . . . generally means what its label suggests: an employee is paid on a salary basis if he or she receives the same wage each pay period.").  DOL has promulgated the following regulation explaining the effect of improper deductions on the exemption status of employees:

> An employer who makes improper deductions from salary shall lose the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis. An actual practice of making improper deductions demonstrates that the employer did not intend to pay employees on a salary basis.

MEMORANDUM OPINION AND ORDER – PAGE 5

29 C.F.R. § 541.603(a).  The Court thus considers (1) "the number of improper deductions, particularly as compared to the number of employee infractions warranting discipline," (2) "the time period during which the employer made improper deductions," (3) "the number and geographic location of employees whose salary was improperly reduced," (4) "the number and geographic location of managers responsible for taking the improper deductions," and (5) "whether the employer has a clearly communicated policy permitting or prohibiting improper deductions."  29 C.F.R. § 541.603(a); *see Escribano*, 947 F.3d at 274 ("The ultimate inquiry is now just 'practice'".).

## V.  DEFENDANTS DID NOT PAY PLAINTIFFS ON A SALARY BASIS

It is undisputed that from April 2017 to October 2019, Defendants paid Plaintiffs an hourly wage.  Pls.' Summ. J. Br. 4; Defs.' Summ. J. Resp. Br. 19 ("This had the unintended consequence of paying any hospitalist shift provider who clocked out prior to the end of his or her shift exactly their hours worked, instead of the guaranteed salary equivalent to 10-hours per shift."); *see also* Pls.' App. 8, 26, 35, 42.  Defendants instead argue that they *intended* to pay Plaintiffs on a salary basis and therefore the payment of hourly wages or practice of deductions would not render Plaintiffs nonexempt.  Defs.' Summ. J. Resp. Br. 15.  The Court disagrees.  The subjective intent of Defendants' executives in implementing the new timekeeping system cannot outweigh the actual pay practices that Defendants' managers intentionally implemented and perpetuated over a two-year period.

### A.  Background on the Implementation of the API Timekeeping System

In January 2017, Defendants implemented a new timekeeping system called API. Defs.' App. 50.  Defendants instructed APPs to clock in and clock out of the API system at the beginning and end of each shift.  *Id*. at 6.  Defendants' subjective intent in creating this system was to simultaneously pay the base salary while allowing "beyond pay" for hours in excess of the standard 10-hour shift or shifts in excess of the 16 required per month.  *Id*.

The API system took into account the classification of APPs as exempt and preloaded a standard 40-hour workweek.  *Id*. at 7.  Defendants referred to these prepopulated hours as the "forever schedule."  *Id*. at 33–34.  Because the APPs were clocking in and out for each shift, the prepopulated schedule would duplicate hours worked and initially resulted in overpayments.  *Id*.  Human Resources informed the managers that due to the APPs' exempt status, the managers could not permanently alter the forever schedule.  *Id*.

Defendants' managers realized that the forever schedule was not compatible with the system of clocking in and out, so they decided to mark the forever schedule as unpaid or manually remove the hours from the system altogether.  *Id*.  The record shows that the managers instituted the new system with the knowledge that their actions would effectively result in an hourly rate.  Pls.' App. 31 ("You will be paid for exactly the time you are clocked in at the hospital.").  In an email to all APPs, LaQuanda Thompson, on behalf of Jennifer Saoit, declared that the new clock-in system would begin on April 3, 2017, and result in hourly pay for exactly the time clocked in at the hospital.  *Id*.  Defendants would

not pay Plaintiffs for any time off the clock outside of the hospital or for meal breaks.  *See* Pls.' Reply App. 30, 52, 92 [85-2].  Despite the drastic change to the APPs' compensation structure, none of the copied supervisors verified the intentions behind the API system, and they continued deducting wages for over two years.  The system as designed would have paid Plaintiffs a salary through the forever schedule had the managers not intervened.  *See* Defs.' App. 6–7, 32–34.  Thus, Defendants' managers affirmatively made manual changes to Plaintiffs' compensation from salaried to hourly *every pay period* for two and a half years.

The de facto hourly wage system eventually came to the attention of Defendants' executives in October 2019 when Thompson could not remove the forever schedule in a timely manner.  *Id*. at 84–86.  Thompson alerted human resources that she needed additional time to complete the necessary adjustments to the APPs' payroll.  *Id*.  When human resources reviewed the request, they found inaccuracies and manual changes that should not have occurred for exempt employees.  *Id*. at 59–60.  This prompted an audit of the API system and resulted in reimbursements to APPs who were still employed by Defendants.  *Id*. at 7, 56.

### B.  The Section 541.603 Factors Show Defendants Did Not Pay Plaintiffs on a Salary Basis

The first Section 541.603 factor, the number of improper deductions, weighs in favor of finding that Defendants did not pay Plaintiffs on a salary basis.  It is undisputed that from April 2017 to October 2019, Defendants improperly deducted at least $73,086.05 from the wages of 40 APPS, amounting to approximately 1.54% of these APPs' total pay.

MEMORANDUM OPINION AND ORDER – PAGE 8

Defs.' Summ. J. Br. Resp. 9, 11.  The parties dispute the proper methodology to calculate the number of deductions.  *Compare* Pls.' Reply Supp. Summ. J. 10–11 (using Defendants' hourly pay practices to calculate deductions within each pay period) *with* Defs.' Sur-Reply 2 (denigrating Plaintiffs' calculations as akin to "totaling the number of days in the year and declaring it rained 365 days").   The disputed facts, however, do not create a genuine issue for trial.   Assuming *arguendo* that Plaintiffs' suggested method is incorrect, Defendants' own audit reports still show at least 1500 deductions from the wages of thirteen Plaintiffs during the relevant time period.  Pls.' App. 28.  Accordingly, the first factor weighs against Defendants.

The second factor, the time period during which the improper deductions were made, favors finding that Defendants did not pay Plaintiffs on a salary basis.  As noted above, Defendants' practice of deducting Plaintiffs' wages continued for approximately two and a half years from the implementation of the clock in system in April 2017 until the system was audited in October 2019.  Defs.' App. 50, 84–86.  The extended amount of time during which these deductions occurred favors a finding that Plaintiffs were not paid on a salary basis.

The third factor, the number of employees from whom improper deductions were made, shows that Defendants did not pay Plaintiffs on a salary basis.[2]  It is undisputed that

---

[2] Although the third factor considers both the number and geographical location of the affected employees, the parties did not explicitly address the issue of the Plaintiffs' geographical location in their summary judgment briefing.  It appears that Plaintiffs worked primarily at BSWH locations in the Dallas-Fort Worth metroplex.  *See* Pls.' App. 79–86; Defs.' Resp. Opp. Pls.' Mot. Conditional Certification 1–2 [14] (stating that "[a]ll of the plaintiffs worked in the North Texas Division for Health Texas").

Defendants made deductions to the wages of 40 APPs.  Defs.' Summ. J. Resp. Br. 17.  This amounts to over 90% of APP shift-providers,[3] and weighs in favor of finding that Plaintiffs were not paid on a salary basis.

The fourth factor, the number of managers making improper deductions, show that Defendants did not pay Plaintiffs on a salary basis.  At least five managers actively participated in the system of removing the forever schedule and inputting the employees' time to the minute.  Pls.' App. 31; Pls.' Reply App. 47–53.  At least eight managers or supervisors should have been aware that their actions were resulting in Plaintiffs receiving hourly wages.  *See* Pls.' App. 30–31 (copying practice administrators and doctors on an email written by Thompson instituting the new hourly wage policy); Pls.' Reply App. 47–53 (explaining the overpayment issues and the proposed adjustment plan to a team of managers and human resources professionals), 62–63 (explaining that Angela Sims, the director of operations, took over Saoit's responsibilities for an interim period), 75.  The management officials who should have had knowledge of the violations ranged from practice administrators to physicians to the director of operations.  *See* Pls.' App. 31; Pls.' Reply App. 62–63.  Defendants' practice of calculating an hourly wage cannot be ascribed

---

[3] While Defendants attempt to use the total number of APPs they employ within the state of Texas as the denominator, Defs.' Summ. J. Resp. Br. 17, the more representative measure is the subset of shift-provider APPs.  As Defendants have previously admitted, the other groups of APPs are not compensated in the same manner, do not engage in the same form of shift work, have different time recording practices, and are employed in wholly different roles.  Defs.' Resp. Opp. Pls.' Mot. Conditional Certification 5–6; *see also* 29 C.F.R. § 541.603(b) (explaining that the exemption is lost for employees in the same job classification working for the same managers responsible for the improper deductions). The Court will consider only employees who are similarly classified in this analysis.

to a single rogue or malicious manager. Rather, the practice was endorsed by multiple administrators at different levels of management; accordingly, this factor weighs in Plaintiffs' favor.

Defendants point to two factors supporting their position that they intended to pay Plaintiffs on a salary basis. First, Defendants have provided emails and testimony indicating that upper-level executives who implemented the API timekeeping system intended to continue paying the APPs a salary while adding "beyond pay" to biweekly paychecks. *See*, *e.g.*, Defs.' App. 6–7, 33–34. Second, Defendants' Timekeeping and Pay Policy prohibited improper salary deductions and was available to employees on the Intranet.[4] *Id*. at 6, 31. Although this limited set of circumstances favors Defendants, it ultimately cannot overcome the objective and definitive evidence provided by Plaintiffs as to four of the five factors. *See Faludi v. U.S. Shale Sols., L.L.C.*, 950 F.3d 269, 276 (5th Cir. 2020) (A "fact issue does not exist simply because facts point in both directions."). Having considered the hundreds of deductions over a two-year period conducted by an entire team of managers from the paychecks of over 40 employees, the Court determines that Defendants did not pay Plaintiffs on a salary basis from April 2017 to October 2019. Accordingly, Defendants are not entitled to rely on Plaintiffs' exempt status as a defense to liability under FLSA for this period.

---

[4] Although there are some disputed facts related to the efficacy of the policy's language and distribution, *see* Section VI(C) *infra*, the Court assumes for purposes of the salary basis analysis that this factor weighs entirely in Defendants' favor.

MEMORANDUM OPINION AND ORDER – PAGE 11

## VI.  DEFENDANTS CANNOT RELY ON THE WINDOW OF CORRECTIONS OR SAFE HARBOR DEFENSES

### A.  The Defenses Require Payment on a Salary Basis

To rely on either the window of corrections or safe harbor defense, the employer must first have paid the employee on a salary basis; these defenses cannot be used retroactively to turn nonexempt employees paid an hourly wage into exempt employees paid on a salary basis.  *See, e.g.*, *Fraser v. Patrick O'Connor & Associates, L.P.*, 2016 WL 8710460, at *6 (S.D. Tex.  2016) ("[T]he window of correction is now only available when the employer intended to pay its employees on a salary basis.); *Wilson v. Sys. & Processes Eng'g Corp.*, 2010 WL 11575616, at *6 n.9 (W.D. Tex. 2010) (explaining that resolution of salary basis issue in Defendants' favor would require Court to consider applicability of safe harbor provision); *Saunders v. City of New York*, 594 F. Supp. 2d 346, 362 n.109 (S.D.N.Y. 2008) (explaining that FLSA affirmative defenses such as the window of correction "may only be used after an employer has first demonstrated an intention to pay employees on a salary basis");  *see generally*, *Escribano*, 947 F.3d 265 (explaining why the initial question of whether the plaintiffs were paid on a salary basis must be answered in the affirmative before any FLSA exception or exemption could be established).  As discussed in Section V, the Court concludes that Defendants did not pay Plaintiffs on a salary basis from April 2017 to October 2019.  Accordingly, the window of corrections and safe harbor defenses cannot shield Defendants from FLSA liability.  In an abundance of caution, the Court independently analyzes the Defendants' asserted defenses.

## B.  Defendants Did Not Satisfy the Window of Corrections Defense

To retain the employee's nonexempt status and avoid liability under the window of corrections defense, the employer must show that (1) the improper deductions were "isolated or inadvertent," and (2) that the employees have been reimbursed for the improper deductions.  29 C.F.R. § 541.603(c).

Defendants' managers intentionally deducted from Plaintiffs' wages.  The record shows that when instituting the new system of clocking in while removing the forever schedule, the managers acted with the knowledge that their actions would effectively result in an hourly rate.  Pls.' App. 31 ("You will be paid for exactly the time you are clocked in at the hospital.").  The system as designed would have paid Plaintiffs a salary through the forever schedule had the managers not intervened.  *See* Defs.' App. 6–7, 32–34.  In an email to all APPs, Thompson, on behalf of Saoit, declared that the new clock-in system would begin on April 3rd and result in hourly pay for exactly the time clocked in at the hospital.[5]  Pls.' App. 31.  Despite the drastic change to Plaintiffs' compensation structure, none of the copied supervisors verified the intentions behind the API system and continued deducting wages for over two years.  The managers' deliberate decision to change the APP compensation structure is underscored by the fact that an employee flagged the potential

---

[5] Defendants argue that this email was an unauthorized change in policy by Saoit.  Defs.' Summ. J. Resp. Br. 7.  But whether the email was authorized or not does not alter the fact that the change was *intentional*.  Moreover, the evidence appears to undermine Defendants' claim of a rogue change, as Saoit discussed her concerns related to overpayment with both practice administrators and human resources professionals and cleared the new system of adjustments with a senior level employee in BSWH human resources.  Pls.' Reply App. 47–53.

loss of exempt status under FLSA due to hourly pay.  *Id*. at 30.  Defendants cannot rely on their managers' misunderstanding of the purpose of API's forever schedule to disregard the intentional decision to create an hourly wage system.  Accordingly, the Court concludes that Defendants' improper deductions were not inadvertent.

Further, the deductions took place over an extended period amongst a large group of employees.  It is undisputed that from April 2017 to October 2019, Defendants made, at a minimum, improper deductions to the wages of 40 APPs in the amount of $73,086.05, approximately 1.54% of these APPs' total wages.  Defs.' Summ. J. Br. Resp. 9, 11.  There is no Fifth Circuit case law setting out a framework to analyze whether deductions are isolated, and as such the Court uses the factors set out by the DOL regulations.  Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122-01, 22181, 2004 WL 865626 (Apr. 23, 2004) (codified at 29 C.F.R. § 541) ("Whether deductions are "isolated" is determined by reference to the factors set forth in final subsection 541.603(a).").  As discussed in Section V(B), the Court has concluded that these factors favor the Plaintiffs.  Moreover, Defendants' conduct does not fall within the ordinary meaning of isolated.  *Isolated*, Merriam-Webster Dictionary (11th ed. 2003) (defining "isolated" as "sporadic" or "occurring alone or once").  The cases cited by Defendants are inapposite;[6] this case

---

[6] In *Rebischke v. Tile Shop, LLC*, 229 F. Supp. 3d 840, 852 (D. Minn. 2017), the employer conducted 22 improper deductions over a period of three years.  In *Crabtree v. Volkert, Inc.*, 2012 WL 6093802, at *9–11 (S.D. Ala. 2012), one manager made 17 deductions to four employee's wages over four years.  In stark contrast, Defendants conducted at least 1500 deductions to the wages of over 40 separate employees in two and a half years.  Defs.' Summ. J. Br. Resp. 9; Pls.' App. 28.

combines a large number of employees, an entire team of managers, a significant amount of wages, and an extended time period. Accordingly, the Court concludes that Defendants' deductions were not isolated.

Defendants have partially satisfied the second element, reimbursement of improper deductions. Defendants have shown, and Plaintiffs do not dispute, that Defendants conducted a payroll audit to determine the scale of improper deductions. Defs.' App. 7. Defendants reimbursed current employees for all deductions made during the relevant period. *Id*. However, while Defendants paid back their current employees, Defendants have never paid their former employees the deducted wages from the relevant period. Pls.' App. 11. Therefore, the second element has only been satisfied as to current employees.

The Court concludes that the window of corrections defense cannot be invoked as the deductions were not inadvertent or isolated. Moreover, Defendants have yet to reimburse their former employees for the improper deductions. Accordingly, as a matter of law, Defendants did not satisfy the window of corrections defense.

### C. There is a Genuine Dispute of Material Fact as to the Safe Harbor Defense

To retain the employee's nonexempt status and avoid liability under the safe harbor defense, the employer must have a "clearly communicated policy that prohibits the improper pay deductions . . . and includes a complaint mechanism, reimburse[] employees for any improper deductions, and make[] a good faith commitment to comply in the future." 29 C.F.R. § 541.603(d). The DOL regulations provide the example of a written policy distributed through the employer's intranet to satisfy the clearly communicated policy requirement. *See id*. However, an employer who "fails to reimburse employees" or

"continues to make improper deductions after receiving employee complaints" cannot invoke the safe harbor defense.  *Id.*

There is a genuine dispute of material fact as to whether Defendants had a clearly communicated policy prohibiting salary deductions from exempt employees.  Defendants have provided declarations and testimony demonstrating that the Timekeeping and Pay Policy prohibiting improper salary deductions was available on the Intranet.  Defs.' App. 6, 31.  As explained in the DOL regulations, the best evidence of a clearly communicated policy is a written policy distributed through different means, for example, on the employer's Intranet.  29 C.F.R. § 541.603(d).  On the other hand, Plaintiffs point to inadequacies in both the distribution and language of the policy.  Pls.' Summ. J. Br. 17–19.  Plaintiffs have provided deposition testimony from both managers and employees stating that they were never made aware of the policy or did not understand it to prohibit hourly compensation or the types of deductions made in this case.  *See, e.g.*, Pls.' App. 34, 36, 38.  In light of the conflicting evidence, a reasonable jury could find that Defendants satisfied the clearly communicated policy requirement.

The policy adequately explained the complaint mechanism employees could follow if they believed an improper deduction had occurred.  The provision directs employees to report any improper deductions to the employee's direct supervisor or BSWH's human resources department.  Defs.' App. 31.  The policy promises a prompt investigation by BSWH and that all improper deductions would be reimbursed.  *Id.*  Accordingly, the complaint mechanism requirement is satisfied.

MEMORANDUM OPINION AND ORDER – PAGE 16

Defendants have satisfied the reimbursement requirement for current employees but has not as to former employees. As discussed in Section VI(B) above, the payroll audit resulted in lump sum reimbursements for Defendants' current employees. Pls.' App. 11. But Defendants have never paid back former employees for any improper deductions during the relevant period. Accordingly, the safe harbor defense cannot apply to unreimbursed former employees.

There is conflicting evidence as to whether Defendants have demonstrated a good faith commitment to avoid improper deductions in the future and have not made any willful violations after employee complaints. There are two competing positions as to when employee complaints began. Plaintiffs assert that Defendants received the first complaint via email in April 2017; therefore, any subsequent willful violations would preclude the safe harbor defense. Defendants argue that the Court should consider the discovery of the discrepancies by BSWH's director of financial services as the threshold. The good faith commitment would be satisfied because Defendants began the payroll audit immediately, made prompt reimbursements, and never made another improper deduction. In light of the ambiguity as to whether the April 2017 email was a complaint, the Court cannot rule, as a matter of law, that Defendants willfully violated FLSA after employee complaints began.

Defendants have provided evidence on each element of the safe harbor defense sufficient to create a genuine dispute of material fact as to current employees. However, Defendants cannot invoke the safe harbor defense against Plaintiffs who have not been compensated for the improper deductions. Accordingly, the Court grants summary

judgment as to liability to former APPs whose employment ended prior to the corrective pay audit.

### CONCLUSION

Because Defendants did not pay Plaintiffs on a salary basis, the Court grants summary judgment as to liability against HTPN.  However, because there are genuine disputes of material fact as to the Defendants' status as joint employers, the Court does not grant summary judgment against BSWH.


Signed February 6, 2023.


David C. Godbey
Chief United States District Judge